### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | |
|---|---|
| MICHAEL E. ELLIS, ) | |
|           Plaintiff, ) | |
| v. ) | |
| ) | Case No. 06-2189 |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
|           Defendant. ) | |

# O R D E R

In March 2006, Administrative Law Judge (hereinafter "ALJ") Joseph Warzycki denied Plaintiff Michael Ellis' applications for social security supplemental security income (hereinafter "SSI") and disability insurance benefits (hereinafter "DIB"). The ALJ based his decision on a finding that Plaintiff was able to perform a number of jobs existing in the national economy.

In September 2006, Plaintiff filed a Complaint (#1) against Defendant Jo Anne Barnhart,[1] Commissioner of Social Security (hereinafter "Commissioner"), seeking judicial review of the ALJ's decision to deny social security benefits. In June 2007, Plaintiff filed a Motion for Summary Judgment (#12). In September 2007, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#16). After reviewing the administrative record and the parties' memoranda, this Court **GRANTS** Plaintiff's Motion for Summary Judgment **(#12)**.

### I. Background
### A. Procedural Background

Plaintiff first filed applications for DIB and SSI in July 2003, alleging disability beginning January 1, 1999. The claims were denied initially in September 2003 and upon reconsideration in December 2003. Plaintiff filed a written request for a hearing, and ALJ Warzycki held hearings in December 2005 and January 2006. In March 2006, the ALJ issued a

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d)(1), we have substituted Michael J. Astrue for Jo Anne Barnhart as the named defendant.

decision finding that Plaintiff was not entitled to benefits. In July 2006, the Appeals Council denied Plaintiff's request for review. Pursuant to 42 U.S.C. § 405(g), Plaintiff sought judicial review of the final administrative decision of the Commissioner of Social Security denying his claims for benefits.

### B.  Plaintiff's Background

Plaintiff was seventeen years old on his alleged onset date and twenty-four at the time of the ALJ's decision. He graduated from high school in May 2000 after completing his Individualized Educational Program. (R. 197.) During high school, Plaintiff worked with the assistance of a personal assistant and job coach as a dishwasher, custodian, and stock boy. (R. 94.) In July 2001, under a special program, Plaintiff began work as a "feeder" at Model Star Laundry. (R. 103-04.)

### C.  Plaintiff's Condition
#### 1.  Residual Functional Capacity Evaluation

In September 2003, the state agency consulting psychologist, John Tomassetti, reviewed the evidence available at the time and completed a Residual Functional Capacity (hereinafter "RFC") Assessment. Under "Sustained Concentration and Persistence," the evaluator rated Plaintiff as "not significantly limited" in his ability to carry out very short and simple instructions, to sustain an ordinary routine without supervision, and to make simple work-related decisions. (R. 239.) Also under that heading, he rated Plaintiff "moderately limited" in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or proximity to others without being distracted by them. (R. 239.) Under "Understanding and Memory," he rated Plaintiff as "not significantly limited" for both the ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions; however, he rated him "moderately limited" in his ability to understand and remember detailed instructions. (R. 239.)

Dr. Tomassetti also found Plaintiff "not significantly limited" with regard to his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 239.) He rated Plaintiff "moderately limited" in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 240.) Under "Adaptation," the RFC Assessment indicated that Plaintiff was "moderately limited" in his ability to respond appropriately to changes in the work setting. Dr. Tomassetti also rated Plaintiff as "not significantly limited" in his ability to be aware of normal hazards and take appropriate precautions. (R. 240.)

### 2. Reports of Vocational Evaluators

Randy Hurt, vocational evaluator, and Sandra Martin, pre-vocational coordinator for the Vermillion Association for Special Education, assisted Plaintiff's job placement during high school. In January 2006, Mr. Hurt assessed Plaintiff's "Ability To Do Work-Related Activities." Ms. Martin also completed a portion of the same questionnaire.

In his report, Mr. Hurt rated Plaintiff "good" for remembering work-like procedures and between "good" and "fair" for understanding, remembering, and carrying out very short and simple instructions. (R. 243.) Mr. Hurt marked "fair" for the ability to sustain an ordinary routine without special supervision, which indicates that Plaintiff's ability to function in this area is seriously limited, but not precluded. (R. 243.) He marked "poor or none" in reference to Plaintiff's ability to maintain attention for a two-hour segment, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, and accept instructions and respond appropriately to criticism from supervisors. (R. 243.) A rating of "poor or none" indicates no useful ability to function in these areas. (R. 243.) Additionally, Mr. Hurt wrote:

3

> Michael is capable of doing certain duties as long as he has direct supervision by a job coach or natural support (co-worker) at his place of employment. Michael is not capable and cannot handle a change in his routine. He was successfully closed only due to natural supports being established at work. Should certain supports leave his place of employment, he would not be successful.

(R. 243.)

Mr. Hurt rated Plaintiff "poor or none" in regard to his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in a routine work setting. (R. 243.) He rated Plaintiff's ability to maintain regular attendance and be punctual within customary, usually strict tolerances, as "good" and Plaintiff's ability to deal with normal work stress and be aware of normal hazards and take appropriate precautions as "fair." (R. 243.) At the end of his report, Mr. Hurt wrote, "Michael does not handle stress well." (R. 244.)

The record only contains the last page of Ms. Martin's "Ability to Do Work-Related Activities" assessment dated January 6, 2006. On this page, she wrote, "[i]t was difficult to redirect Michael's attention to other tasks once Michael becomes obsessed with a certain item or procedure." (R. 245.) She wrote the following about Plaintiff's aversion to having anything on his hands: "It should be noted that Michael had a severe aversion (due to his autism) to any task that would require getting his hands dirty from food or other messy items." (R. 245.) She marked "never" in response to the following question: "On the average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work?" (R. 245.)

### D. The Hearing Before the ALJ

The ALJ held a hearing in January 2006, during which Plaintiff, Plaintiff's parents, Dianne Unzicker, general manager of Model Star Laundry, and Dr. James Lanier, a vocational expert (hereinafter "VE"), testified.

Plaintiff testified that when he did janitorial work at the high school, he had someone with him. (R. 306.) He currently works at Model Star Laundry. (R. 284.) He drives about fourteen miles per week to work and back, but his father drove him to the hearing. (R. 281-82.) Plaintiff checks his e-mail every day and plays video games. (R. 288.) He is unable to cook food other than macaroni and cheese and Ramen noodles. (R. 288.) He reads science fiction and horror books. (R. 289.) He goes to the Family Dollar store where he will buy pop. (R. 295, 306.) Plaintiff testified that he needed his mom to show him repeatedly how to get to work in order for him to learn to drive there himself. (R. 301.) He also testified that he sometimes gets sent home from work. (R. 304.) Plaintiff does not have a bank account; he keeps his money in a safe at his home. (R. 308-09.)

According to Ms. Unzicker, Plaintiff can do simple two-step tasks. (R. 316.) She stated as follows: "Once he learns it, he knows it, as long as he's with somebody because he doesn't trust his own judgment." (R. 316.) She also stated, "Michael does not work independently" (R. 311), "always there's a lead person" (R. 311), and "he really needs to, he needs to be looked after" (R. 314). She puts the lead person beside him because "he always has to have somebody with him that's knowledgeable to work with him." (R. 311-12.) She stated that the person is there to help keep him on track (R. 314), and if all employees were like Plaintiff, nothing would get done (R. 317).

Ms. Unzicker testified that when she sends Plaintiff home early it is not because she has no work for him. (R. 312.) She lets him go home because "he'll have a hard time functioning because he's worried about . . . the weather" or because "he can't stand loud noises." (R. 312-13.) She described his reaction to loud noises as follows:

> Whenever he hears a loud noise, he'll grab his ears and then he'll like sit on his knees and blocks out his, his mind for awhile. So if I know there's a lot going to be going on that morning, then I'll let him – I'll say, Mike, you go on ahead and go.

(R. 313.) Ms. Unzicker testified that it was common to send him home early several times per week every week. (R. 313.) Moreover, she monitors him to see if he is becoming distracted or

5

upset. She stated that "we like Mike and like working with him and his disabilities that he has, but we've learned to adjust to that." (R. 313.)

Marie Ellis, Plaintiff's mother, testified that she helped him with his janitorial job at the high school every day after school the first two weeks, acting as his "job coach." (R. 324.) She explained that Plaintiff's brother and sister would help him on Fridays because "there was no way that he could [get] it all done in that amount of time." (R. 325.) She explained that when he worked in his janitorial job, "they always had somebody there to watch over [him]." (R. 327.) After Plaintiff graduated, the Department of Rehabilitation assigned Plaintiff a job coach and helped him find a job. (R. 326.) When Plaintiff started working at the laundry, the job coach went to work with him for the first few months until he was able to work with a lead person. (R. 326.) During all of his jobs, he had a job coach with him. (R. 327.)

Plaintiff's mother testified that Plaintiff "absolutely will not do the dishes because he will not put his hands in the water." (R. 320.) She stated as follows:

> [H]e is fanatical – part of his autism is, you know – they all have different things – and his thing is he will not get anything on his hands. He does not like anything sticky. He does not like any kind of a food thing on his hands. He won't stick his hands in, in like dishwater.

(R. 320.) She explained that she bought rubber gloves for Plaintiff when he worked in the school cafeteria. In describing Plaintiff's aversion, she stated that it was to "just things on his hands" (R. 321), and it was not necessarily limited to messy or food-related substances.

Gary Ellis, Plaintiff's father, testified that when Plaintiff mows the grass, Gary is there the entire time to keep him on task and to make sure that he mows the right areas. (R. 333.)

Dr. Lanier, the VE, testified that Plaintiff had worked as a laundry laborer, an unskilled position at a medium physical exertional level, a stock clerk, a semi-skilled position at a heavy physical exertional level, and a janitor, a semiskilled position at the lower level at a medium physical exertional level. (R. 335-36.) The ALJ described a hypothetical individual with the

6

same education and same past relevant work experience as Plaintiff, with the RFC to perform the exertional demands of a full range of medium work, and with limitations to "simple, repetitive tasks and instructions, and with an increased need for supervision." (R. 336.) The VE testified that such an individual could work as a construction laborer, assembler, fish processing worker, and laundry/dry-cleaning worker. (R. 337.) The VE did not list grocery stocker because of the limitation to simple and repetitive tasks.

When Plaintiff's counsel asked whether the need for constant supervision would affect the hypothetical person's ability to do the jobs listed, the VE answered, "Yes." (R. 337.) When Plaintiff's counsel asked how a need for constant supervision would affect the hypothetical individual's ability to do the jobs cited, the VE responded, "I don't think [inaudible] in the work world." (R. 337.) When Plaintiff's counsel asked the VE whether the hypothetical individual's need for unscheduled breaks several times throughout a workweek would affect that individual's ability to retain employment, the VE responded, "I don't think that person would remain in the work force." (R. 338.) When Plaintiff's counsel asked him whether it would affect employability if the hypothetical person was reduced to eighty percent productivity, the VE responded, "I think that person would not be a mainstay in the work world." (R. 338.) Finally, when Plaintiff's counsel asked the VE whether "an aversion to having anything on his hands due to his autistic condition" would affect the listed jobs, the VE answered, "all of them." (R. 338.)

### E. The ALJ's Decision

The SSA defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a-f). At each step, if the ALJ affirmatively finds the claimant disabled or not disabled, the inquiry ends, but if no determination can be made, the Commissioner proceeds to the next step. 20 C.F.R. § 416.920(a)(4). If the claimant is currently employed or was previously employed during the relevant period, he is not disabled. 20 C.F.R. §

416.920(a)(4)(i). The second question is whether the claimant has a severe medical impairment that will last at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant does not have a severe impairment, the inquiry ends. *Id*. However, if the claimant has a severe impairment, the third step is to ask whether the severe impairment meets or equals one listed in Appendix 1 to subpart P of part 404 of Chapter 20. 20 C.F.R. § 416.920(a)(4)(iii). If it does, the claimant is disabled. *Id*. If it does not, the fourth question is whether a claimant is able to perform his past relevant work with his current impairment. 20 C.F.R. § 416.920(a)(4)(iv). If he can, then he is not disabled. *Id*. If he is not able to perform his past work, the fifth and final question is whether, with his current limitations, he can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 416.920(c)(1).

Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time relevant to this decision. (R. 16.) Evidence established that Plaintiff has the severe impairment of an autistic disorder. (R. 17.) Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in Listing 12.10. (R. 17.) The ALJ determined that Plaintiff had the RFC to perform the exertional requirements of medium work, but that "the work should be restricted to simple, repetitive tasks and accommodate an increased need for supervision." (R. 19.)

The ALJ determined that Plaintiff was capable of performing past relevant work as a laundry worker because "this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (R. 20.) The ALJ further stated as follows:

> Even if the claimant were not capable of performing his past relevant job as a laundry worker the vocational expert testified that there were other jobs in the national economy in significant numbers that a person with the same vocational profile and residual functional capacity as that of the claimant's could perform.

(R. 21.)

## II. Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides

that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. New York*, 305 U.S. 197 (1938)). Where conflicting evidence may allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for making that determination rests with the ALJ. *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Therefore, the question for review is not whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability. *Id*. The Court defers to the ALJ's credibility determinations, "so long as they find some support in the record." *Edwards v. Sullivan*, 985 F.2d 334, 388 (7th Cir. 1993).

### III. Discussion

Plaintiff argues that the Court should remand this case with instructions to award benefits. Alternatively, Plaintiff argues that the Court should remand for reconsideration. Plaintiff specifically argues that (1) the ALJ erred by finding that Plaintiff could return to his part-time work as a laundry worker given the ALJ's finding that this work was not performed at the substantial gainful activity level; and (2) the ALJ's alternative finding that Plaintiff can perform other work cannot be sustained because the ALJ relied on the VE's testimony in response to an incomplete hypothetical question.

### A. Step Four of the ALJ's Analysis

Plaintiff first argues that ALJ erred by finding that Plaintiff could return to his part-time work as a laundry worker given that the ALJ found this work was not performed at the substantial gainful activity level. Plaintiff contends that once the ALJ determines that past work is not substantial gainful activity at step one, then the ALJ cannot use that past work to satisfy step four of the evaluation. *See Lauer v. Bowen*, 818 F.2d 636, 641 (7th Cir. 1987)

In his brief, the Commissioner of Social Security, conceded this point. Accordingly, the Court need not consider it.

### B.  Failure To Consider All Limitations in Decision

Plaintiff next argues that the ALJ failed to include all of Plaintiff's limitations in his RFC and hypothetical questions to the VE.  Specifically, the ALJ did not include Plaintiff's need for constant supervision, his inability to complete a full workday and workweek, his lower productivity level, and his aversion to getting anything on his hands.

#### 1.  Plaintiff's Need for Constant Supervision

Plaintiff argues that the ALJ's RFC failed to include Plaintiff's well-documented need for constant supervision.  Plaintiff contends that the ALJ rejected Ms. Unzicker's testimony and Mr. Hurt's January 2006 evaluation.  Based on the entirety of Ms. Unzicker's testimony, Plaintiff argues that it is apparent that Plaintiff requires constant supervision, a limitation that Mr. Hurt's evaluation also supports.

In response, the Commissioner contends that "none of the medical evidence of record directly supports a need for constant job supervision" (#16, p. 6).  He refers to Ms. Unzicker's testimony that Plaintiff needed to work with a "lead person" (R. 311) and Mr. Hurt's statement that Plaintiff needed "direct supervision" (R 243).  The Commissioner contends that this supports the ALJ's finding and that "this evidence was consistent with a need for *increased* supervision, but not necessarily *constant* supervision, as argued by Plaintiff."  (#16, p. 7 (emphasis added).)

The evidence regarding Plaintiff's need for constant supervision includes Mr. Hurt's vocational assessment that Plaintiff can work "as long as he has direct supervision" (R. 243), and Ms. Unzicker's testimony that he required constant supervision.  In his decision, the ALJ acknowledged that Ms. Unzicker testified that Plaintiff needs someone with him all the time when he works, but the ALJ did not discuss this evidence in his analysis.  The ALJ also questioned Plaintiff's credibility regarding the effects of his autistic symptoms, stating that "the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (R. 20.)

According to the ALJ, "increased" supervision would adequately account for Plaintiff's mental limitations associated with autism. In reaching this conclusion, the ALJ referred only to Mr. Hurt's statement that Plaintiff needed direct supervision. (R. 20.)

As an initial matter, it is unclear what the ALJ means by "increased" supervision, but it is not the same as "constant" supervision, as shown by the VE's answers to questions regarding these two levels of supervision. Mr. Hurt's evaluation supports a conclusion that Plaintiff needs constant supervision because he has no useful ability to function in several key areas and this is consistent with Ms. Unzicker's testimony. The overwhelming weight of the evidence indicates that Plaintiff must have constant supervision. The ALJ's RFC and hypothetical question to the VE must incorporate all limitations support by the evidence. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Because the ALJ's RFC and hypothetical question to the VE did not include Plaintiff's need for constant supervision, they were incomplete. Finally, the Court notes that the VE's testimony on this issue is unclear: In response to a question regarding how a need for constant supervision would affect the hypothetical individual's ability to do the jobs cited, the VE responded, "I don't think [inaudible] in the work world." (R. 337.) As a result, the Court remands the case so the ALJ can fully address this issue.

### 2.  Plaintiff's Inability To Complete A Full Workday

Plaintiff next argues that the ALJ failed to consider Plaintiff's need for unscheduled breaks throughout the workweek as well as his lower productivity rate. Plaintiff contends that the ALJ failed to consider the evaluations of Mr. Hurt and the state agency medical consultant and that both evaluators' reports support the conclusion that Plaintiff is unable to work at a productive level and is unable to complete a full workday or workweek on a consistent basis.

In response, the Commissioner argues, "while some of the medical evidence indicated that Plaintiff might have difficulties with concentration, pace, and completion of a workday, all of the sources concluded that, at bottom, Plaintiff was capable of simple, repetitive work." (#16, p. 7.)  In support, the Commissioner refers to the evaluators' determination that Plaintiff was capable of "simple, repetitive work," and Ms. Unzicker's testimony that Plaintiff could perform simple two-step tasks.  In conclusion, the Commissioner stated, "thus, the ALJ reasonably declined to accept functional capacity limitations requiring excessive breaks or a low production rate." (#16, p. 7.)  The Court finds this argument unpersuasive; the fact that Plaintiff is able to perform simple, repetitive tasks does not address or resolve his difficulties with concentration, pace, and completion of a workday.

In his decision, the ALJ relied on the fact that Plaintiff has been successful in maintaining a job as a laundry worker since July 2001 to support his conclusion that "the degree of limitation alleged by the claimant is not consistent with the medical record or his reported daily activities." (R. 20.)  However, this reasoning fails to address the special treatment that Ms. Unzicker has given Plaintiff in his job at Model Star Laundry.  For example, although the ALJ acknowledged that Plaintiff is disturbed by loud noises (R. 17), he did not mention this in his analysis nor did he mention that Ms. Unzicker often sent Plaintiff home to avoid exposing him to loud noises.  In fact, the ALJ stated that Plaintiff "is often sent home when there is no work at the laundry." (R. 17.)  This statement mischaracterizes the facts.  Ms. Unzicker expressly testified that when she sent Plaintiff home early it was to adjust to his limitations, and not because there was no more work for him to do.  (R. 312.)

The ALJ also noted that Mr. Hurt "did not feel that the claimant's impairment would cause him to be absent from work at any time." (R. 18.)  The ALJ reached this conclusion because Mr. Hurt checked "never" in response to the following question:  "On the average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work?" (R. 244.)  However, Mr. Hurt's evaluation also stated that Plaintiff is unable to perform at a consistent pace without an unreasonable number and length of rest periods, and he is unable to complete a normal workday and workweek without interruptions

12

from psychologically-based symptoms. (R. 243.) Based on a review of the rest of Mr. Hurt's assessment, it appears that he construed the question about absence from work as asking whether Plaintiff was able to get to work each day, not whether he was able to *complete* a workday or workweek without unreasonable breaks. (R. 243.) An ALJ may not simply pick out portions of a medical report that favor denial of benefits, while ignoring those favorable to disability. *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984). Here, the ALJ's reference to one response in Mr. Hurt's report clearly ignores the rest of the report that supports substantial limitations. Furthermore, the state agency doctors' RFC assessment also indicates limitations in Plaintiff's ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without psychologically-based interruptions, and perform consistently without an unreasonable number and length of rest periods. (R. 239-40.)

The ALJ's decision did not address Plaintiff's inability to complete a normal workday and workweek without interruption and his inability to perform at a consistent pace without excessive breaks. On remand, the ALJ is directed to address these limitations.

### 3. Plaintiff's Aversion To Getting Anything on His Hands

Finally, Plaintiff argues that the ALJ failed to consider Plaintiff's severe aversion to having anything on his hands. Plaintiff contends that this limitation is well documented in the record.

The Commissioner argues that the ALJ reasonably declined to find any functional limitations relating to Plaintiff's hand use for two reasons. First, the Commissioner stated that "Plaintiff's mother testified that Plaintiff was able to work in a cafeteria with plastic gloves. Thus, there is no reason to believe that Plaintiff's concern about his hands could not be accommodated by wearing gloves at any of the jobs cited by the vocational expert." (#16, p. 7.) Second, Plaintiff's counsel posed a more restrictive limitation to the VE than the evidence supported.

The Court is limited to the reasons provided by the ALJ; it cannot consider Defendant's *post hoc* rationalization for the ALJ's determination regarding the aversion. *See Golembiewski*

*v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Thus, the Court cannot consider the arguments Defendant presented in its brief.

In his decision, the ALJ acknowledged Ms. Martin's statement that Plaintiff had "a severe aversion (due to his autism) to any task that would require getting his hands dirty from food or other messy items" (R. 245), but he failed to mention this problem later in his decision or to consider it in his subsequent analysis and he failed to explain why he did not consider it. The ALJ also acknowledged that Plaintiff had previously worked as a dishwasher, but did not refer to his mother's testimony about that experience. The ALJ mentioned nothing else regarding the aversion or the possibility of wearing of gloves in his decision.

The ALJ's RFC and hypothetical question to the VE must incorporate all limitations supported by the evidence. *Steele*, 290 F.3d at 942. Meaningful review requires the ALJ to articulate his reasons for accepting or rejecting entire lines of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Here, the ALJ did not provide any explanation for failing to consider the evidence regarding Plaintiff's aversion to having anything on his hands. On remand, the ALJ is directed to consider this issue.

### C. The VE's Testimony

As a final issue, the Court also notes that many of the VE's answers seem evasive. For example, the VE's responses to questions about how certain limitations would affect the hypothetical individual's ability to perform certain jobs included the following: "I don't think [inaudible] in the work world" (R. 337), "I don't think that person would remain in the work force" (R. 338), and "I think that person would not be a mainstay in the work world" (R. 338).

These answers were neither responsive nor particularly helpful.  On remand, the ALJ should elicit answers from the VE that are pertinent to the question posed.

### IV.  Summary

For the reasons set forth above, this Court **GRANTS** Plaintiff's Motion for Summary Judgment **(#12)** and remands this case pursuant to sentence four of 42 U.S.C. § 405(g)[2] for further consideration consistent with this Order.

ENTER this 2nd day of July, 2008.

s/ DAVID G. BERNTHAL<br>U.S. MAGISTRATE JUDGE

---

[2]Under 42 U.S.C. § 405(g), sentence four, "[t]he court shall have the power to enter, upon pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."